We have two cases this morning. And the first is Lancaster v. Attorney General, numbers 16-1047 and 16-2581. Ms. Cullen and Mr. Hayes. If you're taking this case, was it pro bono? Thank you very much. You really have our gratitude for doing so. You're welcome. Good morning, Your Honors. I may please support. My name is Kimberly Cullen, and I represent the petitioner, Mr. Doron Lancaster. I'd like to preserve three minutes for rebuttal. You certainly may. If he is removed to Guyana, Mr. Lancaster will be tortured and killed. People will, quote, slaughter him like a cow simply because he is gay. So what evidence do we have of that that's in the record? In the record that he will be subjected to torture because he's gay. Mr. Lancaster submitted principally an issue, in this case, two letters and an affidavit from his family and friends that showed that he will be tortured and killed if he's returned to Guyana because he's gay. Was it Cousin Edrick? Is that right? Yes. What did that letter say? What did that letter say? The letter from his cousin Edrick described the particular individuals in Guyana that are going to kill him and why they're going to kill him, and that also included the detailed threats that he will be, quote, slaughtered like a cow and his blood will run because he's gay. Everyone knows he's gay, and people have been telling his father and family members in Guyana that he's gay. And what is the evidence that the police would not protect? Mr. Lancaster. Yes. The additional evidence that Mr. Lancaster submitted in the case, including reports from Amnesty International, particularly note that individuals in Guyana who are members of the LGBT community, they are particularly hesitant to go to the police for help because they're afraid they'll be discriminated against. There's evidence from other NGOs that report that the police are slow to help LGBT community members with their complaints.  Isn't that kind of also illegal in Guyana? It's a criminal offense. Yes, indeed, and that goes to the fact of why members of the LGBT community are afraid to go to the police in the first place. So the letter detailed the kind of torture that Mr. Lancaster is going to be subjected to. The BIJ and the BIA, didn't they consider, they didn't overlook the letters, they knew about it, and they acknowledged that the letters were there. They just gave it whatever credibility they felt it was deserving of since it was not sworn testimony. Are they required to do that more under the precedent that they were laboring under? Recognized it and they didn't adopt it as, they recognized it, they gave it such weight as they thought it should accord. So according to the precedent of the HLH-BIA decision, when evaluating this type of evidence, the letters from family and friends, the BIA and the immigration judge must evaluate the quality of the letter beyond the nature of the letter writer. That's clear from the precedent how the BIA addressed this evidence in the HLH decision. And looking at what happened in Mr. Lancaster's case, this precedent was not applied correctly. So what should the IJ have done? The immigration judge in one conclusory sentence noted that she did not give these letters, she gave these letters less weight for one reason, because the letter writers were not available for examination in court. And this is only looking... And HLH does allow that. Yes, your honor. HLH absolutely allows the nature of the letter writer to be relevant and part of the decision, but it's not dispositive. So what did she have to say in her, what's 14, 15 page single space decision that would take these letters into account and discount them in a way that you think would be proper? So looking at the precedent from HLH, the quality of the content of the letter needs to be assessed. It has to go beyond just looking at the person who wrote the letter and discrediting it simply because they didn't come to court for whatever reason or because they were related to the petitioner. All HLH says, this relates to China in that case, the authors of the letters are interested persons who are not subject to cross-examination and they cite three cases from circuit courts. Absolutely, your honor. It shows that that is a relevant consideration, but continuing to read the HLH decision, you see that the BIA actually did continue to look at the content of the letters in making its final determination that the letters did not support that petitioner's claim for asylum. Yes, no, and maybe, but in this case, isn't the best that you can hope for is that there would be a remand, the IJ, she would add two or three more sentences and that would be it? No, your honor. What we would hope for is that the immigration judge would properly consider the content of the letters as required by the HLH decision. And that means looking at the content of the letters and evaluating these specific threats that are noted, the fact that he's going to be killed and tortured, taking into account the people that are going to do it. The fact that there are a couple of letters from interested parties who claim that there were rumors spreading up about him that his father, whom he hasn't seen since 2003, knows and that somehow his father might do something and that a letter from his aunt, whom he hasn't seen in 30-some years, that they know about it, etc. Okay, let's assume all that's true, just for the moment. That everything you say, that somebody really does want to try to get him, I don't see how it gets there. But secondly, you've got to go through the hurdle of, is there willful blindness of the authorities to protect him? And he's given next to no evidence whatsoever pertaining to that. The country reports don't completely support that. Thirdly, that he can't relocate to another part of the country. And once again, the burden is on him and there is no way he ultimately can win based on this record. Even accepting what you just said to us. Your Honor, I would disagree that there's absolutely no way that the evidence shows that he could... Well, what evidence do you have that there is evidence that's greater than, more likely than not, that the police would acquiesce, that is, be willfully blind to the harm that he feels is threatened with respect to him? Your Honor, looking at the evidence as a whole and considering what is necessary for remand in this case and it's the harmless error standard here, so... You've got to give me evidence in the record. Sure. The letters from his relatives show that he's going to be killed because he's gay. The letters also show that people in Guyana are not held accountable for his actions. His affidavit from his cousins stated that. And looking at all the other evidence in the record to show that individuals who are LGBT are not likely to report the crimes that are against them. They're not likely to reach out to the government for help because the government, in fact, discriminates against their lifestyle, could put them in jail for that. Looking at all this evidence, it's possible on remand that by ignoring the content of the letters, the immigration judge could have come out differently if they had properly considered the content. And you said the magic word, it is possible on remand. We cannot say it's more likely than not that they will be acquiesced to his being harmed. And what about the relocation? What evidence does he have that there's no way he could relocate to a place that would be safe for him? Looking at the letters particularly, they note that even though your cousins and family live in certain areas of Guyana, one of his cousins lived in a different area and had heard about this all the way in another place. What you need here are country reports. What you need here are, and you could also probably get news articles, what you need are organizations that have done investigations and put evidence in that there is no place in Guyana to which somebody who is gay could relocate and not be in significant danger of being harmed. That would certainly be helpful if there was more evidence in the record. But the question here in front of the court is whether or not ignoring or misapplying the precedent from HLH was a harmless error. Okay, let's go back to that. Once again, how did the court misapply what was basically a one sentence from HLH? The precedent from HLH that is at issue here is the fact that the BIA in that decision looked at the nature of the letter, but they also looked at the quality of the content, showing that that is what needs to be considered when this type of evidence is put before an immigration judge, a board of immigration appeals. Looking at the opinion of the immigration judge and also the BIA in Mr. Lancaster's case, in one sentence they evaluate the quality of the letter and they rely only on one reason, the nature of the letter writer. The immigration judge states, I gave these letters less weight because the letter writers were not available for examination. The BIA approved saying it's okay to give limited weight simply because the letter writer was interested or not available for cross-examination. There's no evidence here that when assessing the quality of the evidence, the immigration judge or board of immigration appeals looked at the content and focused on any of the things that were focused on in HLH. Was the content out of date? Was it irrelevant? Was it devoid of detail such that there was more about the letter that could lessen its weight? So at the end of the day, are you asking us to remit it? Yes, Your Honor. The relief that we're asking for here is for remand, for these letters to be properly considered under the HLH precedent using that legal framework. Ms. Cohen, let me ask you. I have a little bit more basic problem with the case than I think do my colleagues. I'm not too sure we have jurisdiction in this case. You're looking at a fact question here, which the court does not have the ability to assess. The IJ, the BIA made a factual determination, or the IJ did, based on the facts that were before it, the letters and so forth. And I'm at a more fundamental point in this case, wondering whether we should even hear the case, since I don't think we have jurisdiction to resolve this matter, because the IJ saw the facts one way and went that way. Now, maybe if I were the IJ, I would have gone the other way. But that's their prerogative. So how do we even have jurisdiction to hear your case? Your Honor, this court does have jurisdiction to hear this case, because at issue here is whether or not the BIA properly applied the precedent, whether the immigration judge properly applied the precedent for the BIA. The precedent is dictating how the IJ should resolve the matter in an evidence dispute. And the IJ can take any point it wants concerning the credibility of the evidence before it. And that's not our prerogative at the appellate level. We have no jurisdiction to tell them how to assess the credibility of the evidence before them. Yes, Your Honor, the immigration judge does have the ability to weigh the evidence. But the presidential BIA decision, HLH, laid out a framework that needs to be applied. And my question here is whether that framework was properly applied to this specific piece of evidence. Mr. Lancaster is not asking this court to re-weigh all the evidence in the record and come to a different conclusion. His argument for this case is not the ultimate conclusion. It's whether or not that specific piece of evidence, the letters from his family and friends, were evaluated using the proper legal standard from HLH. And whether or not the BIA misapplied their precedent is a question of law that's been recognized by this court in the Kaplan case. And that is what's being asked here, whether or not the BIA misapplied the precedent from HLH. I agree with you that there is jurisdiction to deal with that particular legal matter. But when it does come to facts, let me pick up on what Judge Callen just said. One of my colleagues once said with regard to immigration cases, if I only knew, if I could just know who's telling the truth and who's not. And the person on the front line is the I.J. And this I.J., you can't say that this was a cursory opinion of the I.J. It's 16 pages. And it goes into a lot of detail and ultimately concludes that he hasn't made the case. There isn't enough corroboration. And there isn't, she doesn't believe that he necessarily would be harmed. She doesn't believe that there would be acquiescence of the police to his being harmed. And she doesn't believe that he's given any evidence that he cannot relocate. And to make those legal determinations, they have to have facts. And she, the facts just aren't there for her to make that determination. How are we to overrule that? I see my time is up. Go ahead. The issue here is whether or not the BIA misapplied the precedent. And if the immigration judge, yes, the immigration judge is allowed to weigh the evidence, make the credibility determination. But here, looking at what happened in Mr. Lancaster's case, she did not follow the precedent that she was supposed to follow. And that is what this court is looking at and needs to remand back for proper consideration. If these letters were considered for the quality of the content, as they should have been under HLH, those letters give Mr. Lancaster's most relevant and probative evidence of the individual threats that are facing him specifically. And as other courts have noted, people that are interested and most related to the petitioner, even though they might be said to provide favorable information, this is the most relevant information that some petitioners can put forth. So this court doesn't necessarily need to say, yes, the immigration judge made the wrong credibility determination. That's not what we're asking. We're asking this court to consider and find that the immigration judge misapplied the precedent and remand is required for her to apply it correctly in order to reach the conclusion of whether or not Mr. Lancaster met his burden of proof. All right. Thank you very much. We'll get you back in rebuttal. Thank you. Good morning, Your Honors. May it please the court, Timothy Hayes on behalf of the Attorney General. It is uncontested that Mr. Lancaster was properly ordered removed on criminal grounds. The court's jurisdiction is therefore limited to any colorable constitutional or legal questions Mr. Lancaster raises in his opening brief. Mr. Lancaster attempts to raise one to the extent that it's colorable and lacks merit. The agency did not ignore the documentary evidence pertaining to Mr. Lancaster's relatives. The IJ referenced the letters in an oral decision. Did she need to do anything more than just reference the letters and dismiss them because they weren't there? Well, I think she has to reference the letters and sort of describe how the letters affect his claim. But I think she can do that in kind of one or two sentences if she wanted to. I don't think that there is any set pattern or method for how an adjudicator has to address the letters. I would say- So how is anybody supposed to review a decision maker's decision if they don't elaborate and say, I looked at it and I didn't buy it? Well, I think in a lot of cases courts will kind of look at the letter and sort of gauge the strength of the letter themselves. And if the letter sort of indicates that there's a lot to the content- She just dismissed them because the witnesses weren't there for cross-examination. She didn't do any kind of analysis of the content of the letters, did she? I believe she did, Your Honor. She referenced the contents of the letters both in her testimony and in an oral decision. At page 88 and 89, and this is the first certified administrative record, she references I believe it's Cousin Saffron's letter. And she also said at page 207 of the testimony that she read that letter the night before. The letters themselves are what's problematic here. It's not so much that there was an interested witness, although that was mentioned, and HLH allows the adjudicator to court at limited weight because of that, but the letters don't really say enough. Each letter is about a page. It's kind of conclusory. It says your father knows you're homosexual or your family's not happy that you're homosexual, but there's no specifics in the way of threats. There is no specifics as to where everyone lives. We know next to nothing about what would happen to him if he were to return to Guyana based on the record as it exists, and that's chiefly the problem in this case. The question, however, is as a matter of process, should the immigration judge not have gone into the letters more, maybe not a whole lot more, but more than just a sentence that says that she's given him limited weight because they were not subject to cross-examination? I think in an ideal decision she would have gone more, but to the extent that she erred as a matter of law because she addressed it that way in a 16-page decision, otherwise I don't think this rises to the level of legal error. I certainly don't think it violates a matter of HLH. HLH has not set out a framework for how the adjudicator is to assess the quality of the evidence. It basically says, as Judge Ambrose mentioned, that the agency has the right to a court limited weight to certain documentary evidence if the person is interested and not available for cross-examination. And that's particularly important in this case because two of the letters are from persons who live in the United States. One of his cousins lives in Virginia and the other cousin lives in New York. The aunt is still in Guyana. And I understand in the record that the proffer was they're not available, they have to work, et cetera, et cetera. Well, the agency has the right to say they didn't take the time to come into court today to give us their testimony. We have a one-page letter from them. It's not even sworn. It's just a letter. That is not enough to show a likelihood of torture on a criminal alien going back to a country. Yeah, but I'm very troubled about the – and I think perhaps a remand as counsel for a more full disposition here because clearly the IJ, I think, crossed the line by telling him you could avoid the whole thing, but having sex with – not having sex with a man and so on, which is none of her business or totally improper way of making a decision-maker and shows that the IJ's mind was made up not by the facts, but by the fact that he was a homosexual. And I think it shows that the decision-making was not a fair resolution of this matter. So why should it be remanded for a clean record here and have it assessed without what I would say is clear prejudice against the petitioner? Well, I agree that some of her comments, particularly when she was eliciting questions, were intemperate. I don't think it showed that she was an impartial adjudicator. I believe she was trying to develop the record with a pro se alien, and she was trying to understand his claim. That fact is irrelevant to her resolution of it whatsoever, yet it took a lot of – she thought it was of some concern that the case could go away because he could stop being a homosexual. Well, she didn't say that – I'm sorry, Your Honor, I didn't mean to talk over you. No, no, that's all right. I'm sorry. I didn't mean to cut you off. She didn't say that in her oral decision. Most of her comments were made – and I read that there were two long passages. One was at transport 47 and the other was at 49, and she did sort of try to elicit, well, if you're hiding here, why can't you hide there? I don't understand why you can't just continue doing that. And then he said, you know what, I want to be an out gay man. I'm not going to hide it. And she said, okay, I have no further questions for you. Well, she said he could avoid being killed by not being a homosexual. I forget the exact words, but that's what I – Oh, I – I'm sorry, Your Honor, I don't recall that particular line. Quote, avoid harm by not having sex with another man. That's what the record reflects. Okay. And this is – so there's factored into her decision-making a provision which is completely out of tone with anything she's supposed to do. Well, I don't agree that – I agree that the comments are intemperate, but I don't think they infested her decision-making because I think overall her decision was a correct one and it reached the right result and a fair record. How can you have a correct decision when you have a prejudiced – Well, I don't think she was prejudiced. I think she – Well, she showed it that she thought that she obviously didn't have a high regard for homosexuals, I would say. Well, or she was ignorant of homosexuals. I mean, it's also possible that she just didn't really understand his claim very well because for a lot of his life he hid it and she didn't – she was just trying to understand what kind of caused him to come out now and when he elaborated on it, she accepted it. Well, she didn't understand the claim. Doesn't that trouble you? Well, no, because she was trying to figure out the claim. She had a pro se petitioner and she was trying to understand his claim fully and that's why she elicited those kind of questions from him. I mean, I agree that I don't – if I was the adjudicator, I wouldn't go there because I don't think it's necessary. But for her, she did. Anything further? And I would also point out at page 216 of the record, after she had that long colloquy, she did say, okay, I'm not judging you, I'm just trying to understand. I think a lot of it is she just was trying to get a grasp on the parameters and the boundaries of his claim. And unless your honors have any further questions. No, no further questions. Thank you very much. Thank you. Ms. Collins, you're coming up. If you could address for a bit the bias issue that was brought up in your brief. Yes, your honor. So beginning with the bias issue, the immigration judge here did show a bias through the questioning in Mr. Lancaster's case because it showed a fundamental misunderstanding of homosexuality and how that's made known to others. I think your opposing counsel may have said maybe she should have asked the questions differently, but were they really antagonistic toward gay individuals or just maybe a little too insensitive perhaps? I mean, she said, you know, could you conceal your identity. It looked to me like she was trying just to find out if he went back and he concealed his identity that he wouldn't be subject to the harm that you're saying would happen to him if he were outed as being gay. Your honor, I wouldn't say that the immigration judge's questions were necessarily antagonistic, but they do show a fundamental misunderstanding of what it means to be gay. That gives an appearance of bias or is actual bias that has been caused for a man in other cases dealing with similar facts. The immigration judge here asked him an inappropriate question that if the answer even were yes, yes, I can conceal my homosexuality. It has no proper purpose in her decision making. But so inappropriate as to show the type of bias that's in Todovorik or other cases. I mean, those are ones where you're saying, okay, that crossed the line. But here it's like somebody is asking innocent questions and maybe they should have been rephrased. But where is the bias that comes out? Where is the antagonism toward gays? This looks like she's trying to say primarily is there a way that you could go back and still be able to exist without being persecuted or harmed by, among others, possibly family members. So, I will say, I will concede that it's not necessarily the most antagonistic or rude things that we see in some of these other cases, but they get at the same core here. As was found in the Second Circuit's decision, Ali, when the immigration judge said no one would know you're gay because you're not going to have a boyfriend, the Second Circuit found that showed a misunderstanding of how people know that someone is gay or it's made aware that you're gay to other people. These questions get at that same sort of core of whether or not people in Guyana would only know Mr. Lancaster was gay if he engaged in same-sex relationships. But further, her questions also got at this reasoning that was sharply criticized by the Ninth Circuit in the Karani case that if you could, putting a choice to a petitioner to either suppress a fundamental part of who they are or live a life of torture is not an appropriate choice to put to someone and is not in any way a valid basis for denying their claims under the Convention Against Torture. So, and even looking at, I see you ran out of time. Even looking at what happened, in her opinion, the only reference she makes to these questions to show that this was not actually a developing of the record, she says, essentially Mr. Lancaster testified that he doesn't think he should have to hide his homosexuality. She never says, yes, I agree with him, that's right. She never accepts that as an appropriate claim, appropriate position for the petitioner to take. She just says that's what he said. These questions served no purpose in developing the record. She never finds them uncritical. But the IJA denied relief because it found that, one, the government of Guyana, were the government of Guyana to punish him for engaging in homosexual acts under the prohibition that exists there, punishment would not qualify as torture, but, as Judge Restrepo noted, that would be, in Guyana, a lawful sanction. Let's eliminate that for the moment. The second and third, however, he did not provide sufficient evidence to establish that his father knows he's homosexual, there was no corroboration, and that there's been spreading that fact in the community. Again, no corroboration. And three, a preponderance of the evidence indicates that if he were returned to Guyana, he, quote, would have the ability to live in any part of the country where he could avoid his relatives, close quote. And a lot of it comes back to where we were at the beginning. There is nothing that I can find that he cannot live, that he's put in, that he cannot live elsewhere in Guyana free from the type of persecution that he fears in the city where his relatives are. I'm not saying there couldn't be a case developed, but on this record, it's not there. You know, I think looking at the fact that homosexuals are, indeed, discriminated against in Guyana, and his cousins know he's gay, Guyana is a small country. Even if he moved to another place in Guyana, that doesn't mean that they couldn't go there and find him and torture him, or even that the general unacceptance of LGBT community members in Guyana wouldn't lead someone else to cause torture to him because he's gay. I think if the content of the letters were appropriately considered under the HRH standard, it's not highly probable that that ignoring it was a harmless error. There is a possibility that it could come out a different way, and that is enough to get a remand here under the harmless error standard. No, that's not the test. He has to show it's more likely than not that he could not relocate and be safe. That he could not relocate, yeah, and be unsafe, I guess. Whatever. Yes, the petitioner does have the ultimate burden to show that he would be more likely than not be tortured, but that fact-finding would occur, again, after the remand in front of the immigration judge. And it's that if this evidence were considered properly, considered with the other evidence in the record to show the police are not going to help him, there are individuals there that know that he's gay, that are identified by name, that they're going to kill him because he's a homosexual, there is, looking at the record, evidence to show that he could potentially suffer torture because he's gay. All right, thank you. Thank you. Is this your first argument before a court of appeals? Yes, it is. It's a Sand South Philly you've done good. Thank you. And thank you to both counsel for well-presented arguments. And we'll take the matter under advisement.